**IN THE COURT OF APPEALS OF IOWA**

No. 17-0505
Filed June 7, 2017

**IN THE INTEREST OF A.G., B.G., and I.G.,
Minor Children,**

**A.G., Mother,**
　　Appellant.

_____

Appeal from the Iowa District Court for Pottawattamie County, Craig M. Dreismeier, District Associate Judge.

The mother appeals from the juvenile court order terminating her parental rights to her three children. **AFFIRMED.**

Sara E. Benson of Benson Law, P.C., Council Bluffs, for appellant mother.

Thomas J. Miller, Attorney General, and Gretchen Witte Kraemer, Assistant Attorney General, for appellee State.

Roberta J. Megel of State Public Defender Office, Council Bluffs, guardian ad litem for minor children.

Considered by Danilson, C.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

The mother[1] appeals from the juvenile court order terminating her parental rights to her three children, A.G. (born in 2013), B.G. (born in 2011), and I.G. (born in 2010).[2] The mother's parental rights were terminated pursuant to Iowa Code section 232.116(1)(d), (e), (f), (i), and (*l*) (2016). She challenges each of the statutory grounds and maintains termination was not in the best interests of the children.

## I. Background Facts and Proceedings.

The Iowa Department of Human Services (DHS) first became involved with this family in April 2014 based on reports from I.G. that her father had hit her in the face, giving her a bloody nose, and had touched her "coochie." Additionally, the mother reported an extensive history of domestic violence between her and the children's father, with the father as the perpetrator. At the time DHS began its involvement, the mother and the children were living at the home of the maternal grandparents.

Shortly thereafter, in May, the mother left the children in the care of relatives and left town in order to resume her relationship with the father. The children were then officially removed from the parents' care by court order.

The parents went a number of months without seeing the children or beginning services. The department had concerns regarding the mother's

---

[1] The father's parental rights were also terminated; he does not appeal.

[2] Pursuant to Iowa Rule of Appellate Procedure 6.201(1)(e)(2), the appellant "shall attach to the petition on appeal a copy of" the petition for termination of parental rights and the order terminating parental rights. We note that the mother has failed to do so here.

mental health, as she had a longstanding diagnosis of bipolar schizophrenia disorder, and the possibility of substance abuse.

In August 2014, the parents stipulated to adjudicating all three children in need of assistance (CINA). The children were then moved from the maternal relatives' home to a foster home closer to where the mother and father had moved, but the parents continued to refuse services for a period of time.

By June 2015, things were going well enough for the family that DHS initiated a trial home visit, placing the children in the care of the parents with DHS supervision. It was ordered the family continue participating in family safety, risk, and permanency (FSRP) services and the mother participate in mental-health services as recommended to deal with her post-traumatic stress disorder (PTSD), anxiety, and bipolar schizophrenia. DHS had ongoing concerns regarding the cleanliness and safety of the home and the general instability in the family's housing situation, but the parents showed progress in their parenting skills and their ability to provide for the basic needs of the children.

The children were again removed from the care of their parents in February 2016, after the children's daycare provider reported the mother had appeared to be intoxicated when she drove the children to daycare that morning. The children and mother had poor hygiene, and the daycare provider noted the youngest child was not in a car seat when the family arrived. When the caseworker received the report and went to the family's last known address, she was told the family no longer lived there. She obtained an updated address and showed up for an unannounced visit, but the father denied her entry into the

home. The mother submitted to a drug screen the next day and tested positive for marijuana.

The mother completed a second mental-health and substance-abuse evaluation in April 2016. The professional completing the evaluation opined:

> [The mother] needs to be receiving therapy for her mental health issues and agreed to return to see this therapist. However, on her second visit she was not invested in the process and doodled throughout most of the session. Currently her life is chaotic and she seems ill prepared to engage in efforts to stabilize her situation. It appears she uses substances, specifically cannabis and alcohol, to cope with her symptoms of PTSD. She does have considerable mental health issues related to being a victim of traumatic experiences and may not have had adequate attachment to her own biological mother when she was born and until her mother left the family. She continues to need a larger support system. She would benefit from earning her GED.

The mother and father separated in June 2016.

After the parents' separation, the mother exhibited increased strain; she was unable to manage the children's negative behaviors during visits and she had outbursts at the children, including an instance when she repeatedly told I.G., "I don't like you either." Additionally, it became difficult for DHS to keep track of where the mother was living, and she was not always reachable by telephone. Without the father to drive her, the mother had new transportation issues. She also continued to be largely unemployed even though she no longer had the father's income as support. At one point, the mother began attending mental health services, but she quit after a of couple sessions.

In August 2016, the mother indicated that she wanted the children to be placed with the maternal grandparents; the children had stayed with the grandparents before—at the outset of the case—and the grandparents had since

become licensed foster parents. The placement was approximately three-and-one-half hours away from the mother's residence, and she was told by DHS they could not help with transportation for visits, but the mother still indicated she wanted the children's placement to be changed. The grandparents agreed to supervise visits between the mother and children.

The mother had one visit with the children at the grandparents' home in early September 2016. She was supposed to have a second visit on September 25, but while she and her new boyfriend were on their way to the grandparents' home, they were arrested. The mother was charged with possession of a controlled substance (marijuana), possession of drug paraphernalia, and possession of prescription drugs. The boyfriend was charged with a number of drug charges and for having a machete in the vehicle. After the grandparents learned of the arrest, they refused to supervise any future visits.

The termination hearing took place on February 6, 2017. The mother had not seen the children in person since the visit in early September. DHS and the mother had set up a schedule where the mother was supposed to call the children three nights a week, starting November 15. In the almost four months the schedule had been in place, the mother had called eleven times. The mother continued to be unemployed. She testified she intended to apply for Social Security Disability benefits based on her bipolar schizophrenia diagnosis and she was getting the application soon. She did not have an answer why she had not applied for the benefits before, since she had been diagnosed more than seven years earlier. The mother did not help support the children financially; she testified she had sent A.G. a big balloon for her birthday and had sent "a

backpack full of books" and two dolls she was not sure they got. The mother claimed she had last smoked marijuana in early January 2017, but she had two positive drug tests after that date. Additionally, she testified she had not quit before because, "I don't have my kids and that's the only thing that seems to help me cope. And once I have my kids, I'll be able to quit. I'll have my one thing that keeps me from doing it." According to the social worker's report to the court, the mother had "limited to no contact with the assigned FSRP provider since the last court hearing" in August 2016.

The juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(d), (e), (f), (i), and (*l*). The mother appeals.

## II. Standard of Review.

We review termination-of-parental-rights proceedings de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

## III. Discussion.

"The first step in our analysis is to determine if a ground for termination exists under section 232.116(1)." *Id.* We may affirm on any ground we find supported by clear and convincing evidence in the record. *Id.* Here, we consider Iowa Code section 232.116(1)(e), which allows the court to terminate if:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (2) The child has been removed from the physical custody of the child's parents for a period of at least six consecutive months.
> (3) There is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so. For the purposes of this subparagraph, "significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties

encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

The mother does not contest that the children have been adjudicated CINA and have been out of her care for at least six consecutive months. Rather, she maintains she had maintained significant and meaningful contact and made reasonable efforts to resume care "to the best of her ability."

We do not believe one visit and eleven phone calls constitute "significant and meaningful contact." The mother made less than one call per week to speak to her children, who were ages six, five, and three. The grandmother reported "the children appear disengaged and there is little to no dialogue" during the calls. The limited number of calls made by the mother were, as the social worker described, "sporadic[] and not necessarily at the agreed upon dates or times." Moreover, the grandmother, who supervised the phone calls, testified the mother was not always appropriate, sometimes making ill-advised promises to the children.

In spite of the mother's contention otherwise, we cannot find she has made reasonable efforts to resume care of the children. The mother has not found employment. A social worker from a local public health agency testified on the mother's behalf that the mother was applying to jobs and intended to pursue a high-school-equivalent degree, but the mother testified her plan was to apply for SSI benefits. There is no indication the mother is able to provide for the children or that she has sought the means to be able to do so. The mother had

not provided financial support for the children while they have been placed with the grandparents. *See* Iowa Code § 232.116(1)(e) (defining the duties of parents to include "financial obligations"). Additionally, she lacks stable housing[3] and has continued to smoke marijuana. The mother testified repeatedly that she does not believe marijuana is a drug and she "d[id]n't see why [her] drug use is actually being brought up." Even if the mother does not believe the use of marijuana affects her ability to parent, it was made clear to her through case plans and court orders that her continued use was a barrier to reunification. *See id.* (defining the duties of parents to include "a genuine effort to complete the responsibilities prescribed in the case permanency plan"). The mother also did not have a driver's license and often struggled to meet her own transportation needs. Finally, we acknowledge the mother testified she had begun to see both a psychiatrist and a therapist to work on her mental-health and substance-abuse needs in January 2017, but we cannot say such few appointments are a "reasonable effort" after nearly three years of court orders to engage in such services.

There is clear and convincing evidence to terminate the mother's parental rights to all three children pursuant to section 232.116(1)(e).

The mother also maintains termination is not in the children's best interests. We disagree. The grandparents have been able to provide stability to the children that they previously lacked. For example, in the school year before

---

[3] The mother testified her current housing was "finally" stable, but we note that she had been living in the home less than two months and was not on the lease. The mother had lived in five different homes between August 2015 and the time of the termination hearing in early February 2017.

the children were placed with their maternal grandparents, I.G. changed schools four or five times and there was concern she would have to repeat kindergarten due to being behind; I.G attended only one school while living with the grandparents. Additionally, the children are bonded with their grandparents. The children lived with the grandparents for a period when the case began in April 2014, and they had been residing with them again for approximately six months at the time of the termination hearing. The children had begun to refer to the grandparents by parental names and would go to them for comfort. The grandparents expressed that they would be willing to adopt all of the children, noting that the siblings are "really bonded to each other."

Because the statutory grounds for termination have been met and termination is in the children's best interests, we affirm.[4]

**AFFIRMED.**

---

[4] We do not consider whether a permissive factor weighing against termination exists, as the mother did not raise the issue. *See P.L.*, 778 N.W.2d at 40 (stating the court need not discuss a step because the parent did not dispute it).